UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Huff, AtLee and Callins
Argued at Richmond, Virginia

MONTANA O'BRIEN TALBERT

MEMORANDUM OPINION[*] BY
v.        Record No. 0624-23-2         JUDGE DOMINIQUE A. CALLINS
NOVEMBER 19, 2024

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
Claire G. Cardwell, Judge

William H. Hurd (Darcy C. Osta; Eckert Seamans Cherin & Mellott,
on briefs), for appellant.

William K. Hamilton, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.

Following a jury trial, the trial court convicted Montana O'Brien Talbert of first-degree

murder. On appeal, Talbert argues that the trial court erred by: (1) excluding testimony about a

statement he made during the incident; (2) qualifying a witness as a blood spatter expert; (3)

admitting the expert's testimony and written report; (4) admitting a responding officer's body-worn

camera recording; (5) finding the evidence sufficient to convict; and (6) admitting police reports

from prior convictions into evidence at the sentencing hearing. We disagree and affirm the

judgment of the trial court.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND[1]

On June 28, 2021, Jasmine Johnson and Talbert lived together with their two children. That night, Johnson and Talbert ended their relationship. After Talbert left the apartment, Johnson called her friend Michael Cross and asked him to come to the apartment to console her. Johnson explained that she and Cross were "just friends" and did not have a sexual relationship. Cross arrived and after spending time together, Cross and Johnson went to sleep in Johnson's bedroom upstairs.

Around 2:00 a.m., Talbert returned to the apartment and knocked on the front door. Johnson moved her children into her room, and Cross hid in the children's room closet. Talbert entered the apartment and as he walked through the living room, he saw Cross's shoes near the couch. Upon seeing the items, Talbert asked Johnson if someone else was there. Talbert then went upstairs "to find the person," and Johnson followed Talbert upstairs.

Cross emerged from the closet and spoke with Talbert. Johnson did not see Cross with any type of weapon, and he did not act aggressively. As Cross descended the stairs, Talbert followed him, pulled out a knife from beneath his shirt, and stabbed Cross from behind in Cross's right shoulder. Concerned for her children's safety, Johnson retreated upstairs and locked herself and her children in a bedroom. She heard Cross repeatedly say, "Call the police."

During the cross-examination of Johnson at trial, defense counsel asked her what Talbert said to Cross prior to the stabbing: "And so [Talbert] said, Get out of here; isn't that a fact?" The Commonwealth objected, arguing that it was "impermissible" for the defense to elicit Talbert's own

---

[1] "In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, [as] the prevailing party at trial." *Griffin v. Commonwealth*, 80 Va. App. 84, 87 (2024) (alteration in original) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)). In so doing, we discard any of Talbert's evidence in "conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom." *Id.* at 87-88 (quoting *Kelley v. Commonwealth*, 289 Va. 463, 467-68 (2015)).

"self-serving" statements while cross-examining a prosecution witness.  Defense counsel and the trial court engaged in the following exchange:

> [DEFENSE COUNSEL]:     Judge, she opened this line of questioning on direct.
>
> THE COURT:     Well, the objection is that it's hearsay because it doesn't fit in the exception if you ask for the statement of your client when it's self-serving.  What's your response?
>
> [DEFENSE COUNSEL]:     I asked the statement, what did she hear my client say?
>
> THE COURT:     That's asking for your client's statement.  And that's -- if it's a statement that's going to serve your case, then there's no exception that applies to that.

The trial court sustained the objection without further argument from defense counsel.

At trial, Richmond City Police Officer Grigsby testified that he responded to the scene and "saw lots of blood" upon entering the apartment.  Officer Grigsby spoke with Johnson and then looked for Cross, whom he found lying outside on the ground not far from Johnson's front door.  Cross was wearing a bloody shirt and a pair of shorts and told Officer Grigsby that he "need[ed] air."  Emergency medical personnel transported Cross to the hospital where he later died from his injuries.

Dr. Jeffrey Gofton testified as an expert in forensic pathology.  He performed Cross's autopsy and observed 14 "sharp force injuries" on Cross's body.  Cross suffered two fatal stab wounds[2] to his chest.  The wounds pierced Cross's heart and lungs.  Cross also had defensive wounds on his left arm and fingers.

_____

[2] The wound labeled "M" was the first fatal wound that Talbert inflicted on Cross's right side, near his shoulder.  Wound "N" was the later fatal wound that Talbert inflicted on Cross's left lower chest.

Virginia State Police Special Agent Angie Witt testified as an expert in blood spatter. She testified about her extensive training and experience with blood spatter analysis. She testified that she had conducted numerous blood spatter analyses across Virginia, both in person and by photographs. Defense counsel conducted voir dire and afterwards announced: "So I'll submit with just -- note an objection and leave it at that, Judge." Counsel stated no basis for the objection.

Agent Witt relied on crime scene photos for her findings. From the photos she was provided, Agent Witt noted a "swipe pattern" on the wall at the bottom of the stairs. She explained that the pattern indicated that a saturated blood source contacted the wall. She opined that the pattern was "very consistent" with someone who had been struck in the right shoulder and was bleeding while descending the stairs. She further testified that it did not appear that Cross had injuries on his left side when he stood on the lower landing.

Agent Witt additionally noted that by the couch there was a pool of blood that took "some time to deposit" in that location. She concluded that based on the large pool of blood, Cross was bleeding significantly by that time. Based on the drip patterns by the door, Agent Witt suggested that Talbert fled the apartment before Cross left.

The prosecution for the Commonwealth asked Agent Witt if the blood swipe found at the bottom of the stairs was "consistent with someone who's been stabbed in the top right shoulder and then shoved into that wall" and swipes across it. Talbert objected "to the characterization of shoved." Talbert agreed that Agent Witt could answer hypothetical questions but asserted that the form of the prosecutor's question was inconsistent "with the rule."

At the conclusion of Agent Witt's testimony, the Commonwealth moved to admit Agent Witt's written report containing her blood spatter analysis. Talbert objected "contingent on cross." Following cross-examination, Talbert argued that the report should not be admitted because Agent Witt's conclusions were not specific enough. The trial court admitted the report, noting that it was

"submitted as containing the conclusions and observations that were already made in testimony and that's been subject to cross-examination . . . ."

The Commonwealth introduced Officer Grigsby's body-worn camera recording and played it for the jury. Talbert did not object. Defense counsel stated, simply, "Submit it." With three minutes remaining until the end of the recording, defense counsel objected to showing the jury the rest of the video, arguing that "what we're going to see the next three minutes is what we've seen the last three minutes, so it doesn't seem to get any more pertinent than what's already been played. It's repetitive and inflammatory." The trial court allowed the Commonwealth to play the rest of the recording because the video had already been admitted into evidence.

Talbert testified that he and Johnson had argued "about nothing" that day. When he returned to the apartment around 2:00 a.m., he had his chef's knife in his waistband because he had used it earlier at work. When he saw Cross's shoes on his way to the kitchen, Talbert became "scared" and "nervous" because he did not know what was "going on." Talbert followed Johnson upstairs and saw Cross when Johnson opened the closet door. Talbert testified that he was "calm, cool and collected" after learning that Johnson had allowed another man into the apartment. Talbert asked Cross to leave and stated that Cross began to exit "in a calm way." Talbert followed Cross down the stairs, and Talbert claimed that he turned around to speak with Johnson and Cross suddenly began choking him. Talbert then stabbed Cross. Talbert testified that Cross attacked him when they reached the bottom of the stairs, and Talbert swung the knife without "looking where [it was] going." Talbert escorted Cross out of the apartment and watched him run off. Talbert then fled the scene before the police arrived, but he turned himself in the following day.

Talbert objected to instructing the jury on first-degree murder, but then stated that the issue was one for the jury and that "all three [levels of homicide] should be offered." The jury found Talbert guilty of first-degree murder.

At sentencing, the trial court reviewed the presentence report without objection, which report included Talbert's criminal history. The Commonwealth also introduced police reports related to Talbert's misdemeanor convictions for assault in 2007 and domestic assault and battery in 2012. Talbert objected to the reports as hearsay. The trial court admitted the reports, noting that "the facts [in a police report] aren't always completely accurate and" the court accepted the reports "in terms of weight in that regard." The trial court sentenced Talbert to 50 years of incarceration with 20 years suspended. Talbert appeals.

## ANALYSIS

### I. Procedural Deficiencies

In his first assignment of error, Talbert argues that the trial court "erred when it excluded corroborating testimony that, when Mr. Cross came [out] of hiding in the children's bedroom closet, Mr. Talbert told him, 'Get out of here.'" He also contends, in his second and third assignments of error, that the trial court erred by qualifying Agent Witt as a blood spatter expert and by admitting her statements and report. Finally, in his fourth assignment of error, Talbert asserts that the trial court erred by allowing into evidence the video and audio recording of the body camera worn by Officer Grigsby because it was highly prejudicial. Finding that none of these arguments were preserved below, we do not consider them on appeal.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. "The purpose of th[e] contemporaneous objection requirement [in Rule 5A:18] is to allow the trial court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials." *Clark v. Commonwealth*, 78 Va. App. 726, 766-67 (2023) (alterations in original) (quoting *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015)). "Specificity and timeliness

undergird the contemporaneous-objection rule [and] animate its highly practical purpose." *Id.* at 767 (alteration in original) (quoting *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019)). "Not just any objection will do. It must be both *specific* and *timely*—so that the trial judge would know the particular point being made in time to do something about it." *Bethea*, 297 Va. at 743 (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)).

"Procedural-default principles require that the argument asserted on appeal be the same as the contemporaneous argument at trial." *Id.* "Consequently, neither an appellant nor an appellate court should 'put a different twist on a question that is at odds with the question presented to the trial court.'" *Id.* at 744 (quoting *Commonwealth v. Shifflett*, 257 Va. 34, 44 (1999)). We "will not consider an argument that differs from the specific argument presented to the trial court, even if it relates to the same general issue." *Clark*, 78 Va. App. at 767 (quoting *Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (en banc)).

A. *Admissibility of Talbert's Statement*

In his first assignment of error, Talbert argues that the trial court erred by excluding the testimony that when Cross came out of the closet, Talbert told him to "Get out of here."[3] Talbert contends that the trial court erroneously excluded this testimony for three reasons: (1) the testimony is not hearsay because it was a command, (2) if it is hearsay, it falls within one or more of the exceptions to the hearsay rule, and (3) the Commonwealth opened the door for this testimony on cross-examination. Because Talbert did not make any of these arguments before the trial court, they are waived on appeal.

---

[3] According to Talbert, this testimony would have refuted the *mens rea* required for his first-degree murder conviction because it "tends to disprove the prosecution's theory that Mr. Talbert acted maliciously and with a premeditation to kill Mr. Cross." Talbert contends that this testimony demonstrates his attempt to "de-escalate the situation."

At trial, the Commonwealth objected on the grounds of hearsay to admitting Talbert's statement, "Get out of here." The trial court then asked Talbert's counsel, "the objection is that it's hearsay . . . . What's your response?" Talbert's counsel's sole response was "I asked the statement, what did she hear my client say?" The trial court then noted "if it's a statement that's going to serve your case, then there's no exception that applies to that."

Talbert did not assert, as he does here, that the statement is not hearsay because "it was a command," that the statement falls under the "excited utterance" or "then existing mental, emotional, or physical condition" exceptions to hearsay, or that the prosecution opened the door for this on cross-examination. Although Talbert made a general objection to the trial court's ruling excluding the statement, he did not respond to the Commonwealth's hearsay objection, nor did he assert to the trial court with any specificity the arguments he now makes on appeal. *See Hicks v. Commonwealth*, 71 Va. App. 255, 266 (2019) ("[M]aking one specific argument on an issue does not preserve a separate legal point on the same issue for [appellate] review." (second alteration in original)). Thus, these arguments are not preserved on appeal.

B. *Qualifying Agent Witt and Admitting Her Written Report*

In his second and third assignments of error, Talbert assigns error to both Agent Witt's qualification as an expert in "blood splatter" and to admitting her opinions expressed in her testimony and in her written report.

Talbert did not provide the trial court with any reason not to qualify Agent Witt as a blood spatter expert.[4] After voir dire, Talbert stated that his questions "[would] be related to her actual findings," not Agent Witt's qualification as an expert. Talbert then asked the court to

---

[4] We further note that in his combined argument section for assignments of error two and three, Talbert only addresses the third assignment and does not develop or support his argument for assignment of error two. "Rule 5A:20 requires each argument to be developed with supporting case law or other authority." *Wells v. Commonwealth*, 60 Va. App. 111, 123 n.8 (2012). Thus, we deem assignment of error two waived.

"[j]ust note my objection and submit on that objection." He did not state the grounds for his objection. As discussed, *supra*, objections must be both timely and specific. Although timely, Talbert did not object to Agent Witt's qualification as an expert. Thus, this argument is not preserved on appeal.

Neither did Talbert argue below as he does on appeal that the trial court failed to make required prerequisite findings regarding the "reasonable degree of probability" of Agent Witt's opinions or if the opinions were speculative. At trial, he objected only to the characterization of the blood stain as having been caused by Cross being "shoved." Talbert has failed to make the same arguments on appeal that he made below and therefore did not properly preserve these arguments for appellate review.

C. *The Body Camera Footage*

Talbert argues, in his fourth assignment of error, that the trial court erred by admitting into evidence the body camera footage worn by Officer Grigsby because it "contains highly prejudicial images and sounds of the wounded Michael Cross lying on the ground, his shirt saturated with blood, loudly pleading for air." Talbert contends that he only objected to the playing of the last three minutes of the recording, but, invoking the ends of justice exception to Rule 5A:18, he asks this Court to consider the merits of his argument that the trial court should have disallowed the viewing of the entire video. Because Talbert did not timely object to any portion of the recording, and because the ends of justice exception does not apply, we affirm the judgment of the trial court.

When the trial court asked if there were any objection to the "body-worn camera footage," Talbert responded with "[s]ubmit it." Right as the final three minutes were about to be played, however, Talbert asserted:

> Judge, just to put on the record, I would make the objection
> voicing to you that what we're going to see the next three minutes
> is what we've seen the last three minutes, so it doesn't seem to get

> any more pertinent than what's already been played. It's repetitive and inflammatory.

The trial court overruled Talbert's objection, stating that the Commonwealth could play or "put in what they want[ed]" because the video had been admitted without objection or redaction.

We agree with the trial court. Talbert had an opportunity to object to the admittance of the final three minutes when the trial court explicitly asked if there were any objection to the "body-worn camera footage." Talbert not only did not object, but he affirmatively stated to "[s]ubmit" the footage. Talbert's later objection was not timely pursuant to Rule 5A:18. Therefore, Talbert failed to preserve this argument for appeal.

Further, the record before us does not warrant application of the ends of justice exception. "'The ends of justice exception is narrow and is to be used sparingly,' and applies only in the extraordinary situation where a miscarriage of justice has occurred." *Holt v. Commonwealth*, 66 Va. App. 199, 209 (2016) (en banc) (quoting *Redman v. Commonwealth*, 25 Va. App. 215, 220 (1997)). Whether to apply the ends of justice exception involves two questions: "(1) whether there is error as contended by the appellant; and (2) whether the failure to apply the ends of justice provision would result in a grave injustice." *Commonwealth v. Bass*, 292 Va. 19, 27 (2016) (quoting *Gheorghiu v. Commonwealth*, 280 Va. 678, 689 (2010)). "The burden of establishing a manifest injustice is a heavy one, and it rests with the appellant." *Holt*, 66 Va. App. at 210 (quoting *Brittle v. Commonwealth*, 54 Va. App. 505, 514 (2009)). "In order to avail oneself of the exception, [the appellant] must affirmatively show that a miscarriage of justice has occurred, not that a miscarriage *might* have occurred." *Id.* (alteration in original) (quoting *Redman*, 25 Va. App. at 221).

"Accurate photographs [or videos] of a crime scene are not rendered inadmissible solely because they are gruesome, and autopsy photographs of the victim are admissible to show the atrociousness or vileness of a crime." *Teleguz v. Commonwealth*, 273 Va. 458, 482 (2007); *see also*

*Burnette v. Commonwealth*, 60 Va. App. 462, 485 (2012) ("A defendant's stipulation with regards to the cause of the victim's death does not allow the appellant to sanitize the evidence and thus preclude the Commonwealth from introducing photographs [or videos] showing the dead victim, even if the pictures may be considered gruesome."). "Such photographs [or videos] must nevertheless be excluded if their prejudicial effect substantially outweighs their probative value." *Teleguz*, 273 Va. at 482. This "weighing is left to the discretion of the trial court and will not be disturbed on appeal, absent an abuse of discretion." *Id.*

Here, the admitted video recording possessed probative value beyond simply identifying the cause of Cross's death. The recording provided the jury with the most accurate scene of the killing. The video showed Officer Grigsby moving throughout the apartment, providing the jury with a sense of the layout to which the witnesses testified. Although the final three minutes portrayed Cross bleeding and gasping for air, we cannot say that the trial court abused its discretion in admitting the entire video, even if the final three minutes demonstrate the "atrociousness or vileness" of Talbert's crime. Thus, we affirm the judgment of the trial court.

## II. Sufficiency of the Evidence

Talbert contends that the evidence is insufficient to support his first-degree murder conviction because the Commonwealth failed to prove that the homicide "was malicious or that it was willful, deliberate and premeditated." Accordingly, in his fifth assignment of error, Talbert argues that his first-degree murder conviction should be reduced to voluntary manslaughter. We disagree.

A motion of the accused to strike the Commonwealth's evidence asserts that the evidence is "insufficient as a matter of law to sustain a conviction." Rule 3A:15(a). In reviewing a challenge to the sufficiency of the evidence, "[t]he only 'relevant question is, after reviewing the evidence in the light most favorable to the prosecution, whether any rational trier of fact could have found the

- 11 -

essential elements of the crime beyond a reasonable doubt.'" *Commonwealth v. Barney*, 302 Va. 84, 97 (2023) (quoting *Sullivan v. Commonwealth*, 280 Va. 672, 676 (2010)). "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Raspberry v. Commonwealth*, 71 Va. App. 19, 29 (2019) (quoting *Burrous v. Commonwealth*, 68 Va. App. 275, 279 (2017)). "In conducting our analysis, we are mindful that 'determining the credibility of the witnesses and the weight afforded the testimony of those witnesses are matters left to the trier of fact, who has the ability to hear and see them as they testify.'" *Id.* (quoting *Miller v. Commonwealth*, 64 Va. App. 527, 536 (2015)). "Thus, we will affirm the judgment of the trial court unless that judgment is 'plainly wrong or without evidence to support it.'" *Id.* (quoting *Kelly v. Commonwealth*, 41 Va. App. 250, 257 (2003) (en banc)).

"In Virginia, every unlawful homicide is presumed to be murder of the second degree." *Tizon v. Commonwealth*, 60 Va. App. 1, 10-11 (2012) (quoting *Pugh v. Commonwealth*, 223 Va. 663, 667 (1982)). To elevate the charge to first-degree murder, the Commonwealth must prove that the defendant committed a "willful, deliberate, and premeditated killing." *Castillo v. Commonwealth*, 70 Va. App. 394, 416 (2019) (quoting Code § 18.2-32). "Premeditated murder . . . contemplates: (1) a killing; (2) a reasoning process antecedent to the act of killing, resulting in the formation of a specific intent to kill; and (3) the performance of that act with malicious intent." *Fields v. Commonwealth*, 73 Va. App. 652, 674 (2021) (alteration in original) (quoting *Rhodes v. Commonwealth*, 238 Va. 480, 486 (1989)). "Because 'premeditation and formation of an intent to kill seldom can be proved by direct evidence, a combination of circumstantial factors may be sufficient.'" *Id.* (alterations omitted) (quoting *Aldridge v. Commonwealth*, 44 Va. App. 618, 655 (2004)). The defendant's intention to kill "need not exist for any specified length of time prior to the actual killing." *Kirby v. Commonwealth*, 50 Va. App. 691, 700 (2007) (quoting

- 12 -

*Remington v. Commonwealth*, 262 Va. 333, 352 (2001)). Rather, "the design to kill may be formed only a moment before the fatal act is committed provided the accused had time to think and did intend to kill." *Id.* (quoting *Remington*, 262 Va. at 352).

To reduce Talbert's first-degree murder conviction to voluntary manslaughter, "the killing must have been done in the heat of passion and upon reasonable provocation." *Dandridge v. Commonwealth*, 72 Va. App. 669, 681 (2021) (quoting *Canipe v. Commonwealth*, 25 Va. App. 629, 643 (1997)). "A person who acts under the heat of passion is 'deaf to the voice of reason' and acts 'on impulse without conscious reflection.'" *Alston v. Commonwealth*, 77 Va. App. 639, 649 (2023) (quoting *Dandridge*, 72 Va. App. at 681). Whether provocation is sufficient to rebut the presumption of malice is a question of fact to be decided by the jury. *Dandridge*, 72 Va. App. at 682 (citing *Woods v. Commonwealth*, 66 Va. App. 123, 131-32 (2016)). "[I]t is also a question of fact whether the defendant committed the homicide before or after his passion had cooled." *Id.* (quoting *Miller v. Commonwealth*, 5 Va. App. 22, 26 (1987)).

A reasonable fact finder could reject Talbert's voluntary manslaughter argument and conclude that his killing of Cross constituted first-degree murder. After leaving Johnson's apartment, Talbert returned late at night and went upstairs upon seeing Cross's shoes. Talbert then confronted Cross and ordered him to leave. Cross complied and began descending the stairs. Instead of allowing Cross to leave, however, Talbert followed Cross down the steps and then repeatedly stabbed him with 14 "sharp force injuries" as Cross tried to flee. Two of the injuries were fatal, puncturing Cross's heart and lungs. Additionally, by Talbert's own words, he testified that he was "calm, cool and collected" upon learning that Johnson had allowed another man into her apartment. Therefore, the jury could have accepted Talbert's testimony regarding his calm demeanor and found that he was not acting under the heat of passion to reduce first-degree murder to voluntary manslaughter.

It is well-established that "determining the credibility of the witnesses and the weight afforded [their] testimony . . . are matters left to the trier of fact, who has the ability to hear and see them as they testify." *Raspberry*, 71 Va. App. at 29 (quoting *Miller*, 64 Va. App. at 536). Here, the jury could have reasonably determined that Talbert committed a premeditated killing and was not acting under the heat of passion. Accordingly, sufficient evidence supports Talbert's conviction.

### III. The Police Reports

In his sixth and final assignment of error, Talbert argues that the "trial court erred at the sentencing hearing when it allowed into evidence double hearsay police reports related to [his] unrelated convictions for 2007 and 2012 misdemeanor assaults." He contends that the trial court failed to find that the hearsay evidence bore "some indicia of reliability." Talbert's argument is meritless.

"Circuit court judges are vested with broad discretion in admitting evidence." *Harvey v. Commonwealth*, 65 Va. App. 280, 286-87 (2015). "In determining the admissibility of evidence at a sentencing hearing, 'the circumstances of the individual case will dictate what evidence will be necessary and relevant, and from what sources it may be drawn.'" *Meekins v. Commonwealth*, 72 Va. App. 61, 68 (2020) (quoting *Beck v. Commonwealth*, 253 Va. 373, 384 (1997)). "Such weighing is left to the discretion of the trial court and will not be disturbed on appeal, absent an abuse of discretion." *Harvey*, 65 Va. App. at 287 (quoting *Teleguz*, 273 Va. at 482).

"To be admissible at criminal sentencing, Virginia case law provides that hearsay evidence must be shown to 'bear some indicia of reliability.'" *Jenkins v. Commonwealth*, 71 Va. App. 334, 344 (2019) (quoting *Blunt v. Commonwealth*, 62 Va. App. 1, 9 (2013)). "In applying this standard, a trial court 'may rely upon [not only] a defendant's criminal record' but also a variety of other categories of evidence." *Id.* at 348 (alteration in original) (quoting *Moses v. Commonwealth*, 27

Va. App. 293, 302 (1998)). "The prosecution is not required to corroborate 'every detail' of the hearsay to meet the necessary threshold." *Id.* (quoting *Henderson v. Commonwealth*, 59 Va. App. 641, 649 (2012) (en banc)).

Here, Talbert challenges the admission of the police reports. The police reports, however, led to his convictions for each misdemeanor offense. As such, the reports bore some indicia of reliability. Further, the trial court did not appear to consider the reports when crafting Talbert's sentence. The court specifically stated that police reports are not always completely accurate and that it would weigh that when considering all the evidence. Although the trial court referenced Talbert's prior convictions, it did not note any of the details of the offenses as described in the police reports. Further, the trial court noted that Talbert did not have a history of violence and agreed that the sentencing guidelines "seem[ed] high." The trial court then sentenced Talbert below the low range of the recommended sentence. Given the reliability of the reports and the trial court's lack of reliance on them in sentencing Talbert, we find no abuse of discretion with the court's admission of the reports at the sentencing hearing.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

*Affirmed.*